Case 20-1137, USA v. Paul Nicoletti. Oral argument, 15 minutes per side. Ms. Yarbrough for the appellant. Good afternoon, your honors. I'm Tyler Yarbrough. I represent the appellant, Paul Nicoletti, in this matter, and I would request three minutes for rebuttal, please. Mr. Nicoletti's convictions for bank fraud and conspiracy to commit bank fraud should be in this case. In the light most favorable to the government, the proof at trial showed that Mr. Nicoletti and others submitted loan applications bearing false information with the intent to obtain money belonging to Fifth Third Mortgage Michigan LLC, which at the time in 2005 was not a crime under the federal bank fraud statute. In 2005, Fifth Third Mortgage Michigan LLC was not a financial institution as that term is defined under the bank fraud statute and as such did not come under the bank, the jurisdiction of the bank fraud statute. Going forward, I will refer to this entity simply as Fifth Third Mortgage for ease. Can you outline for us the relationship between Fifth Third Mortgage and Fifth Third Bank at any location and if there are other relevant entities in there also? Because there seems to be there seems to be a question in the evidence as to what that relationship is. Sure. Mr. Cliffel was the primary witness presented by the government. He was an employee of Fifth Third Bank and he described the relationship of the bank entities. At the time, Fifth Third Mortgage, and I'm speaking in 2005, was not a federally insured depository institution but was a mortgage lending arm of Fifth Third Bank. That was the best description that I could see in the evidence for what Fifth Third Mortgage was. But Mr. Cliffel also offered testimony that Fifth Third Bank, but otherwise the evidence is not entirely clear. There was some evidence that it was a subsidiary, but as this court knows, that is not enough to establish that Fifth Third Mortgage was a financial institution as that term was defined. But their money was under the custody and control of a federally insured institution. Mr. Cliffel's testimony was that in 2005, Fifth Third Mortgage held accounts at Fifth Third Banks. He didn't offer any... Is that a yes then? Well, what I would say is that... It wasn't under their custody and control? It's that that was true in 2005. With respect to these transactions, Mr. Cliffel didn't offer specific testimony about these transactions. He didn't have So yes, Fifth Third Mortgage had accounts at a Fifth Third Bank, but the testimony about the specific transactions at issue in this matter is not... But can a rational juror conclude that if they held their money at Fifth Third Bank, that the money in these particular transactions came from Fifth Third Bank and the most favorable to the government? Well, in this court's Banyan opinion, which adopted the analysis of other circuits, the government had to prove that Mr. Nicoletti and his co-defendants knew or was... They were at least aware that the property they were seeking to obtain was in the custody or control. That's the issue here. And because of that, there is no... All of the evidence pointed to Mr. Nicoletti's knowledge that he was exclusively with Fifth Third Mortgage. Well, doesn't it go one tier back? Isn't the question, where did Fifth Third Mortgage obtain the funding that it then used? I mean, was there proof? Did the government prove that Fifth Third's mortgage money came from Fifth Third Bank? So on that point, there was... The government points to the testimony of Mr. Cliffel, which again was not specific to these transactions, just as to the general practice in 2005. The government points to two official checks that were drawn on a Fifth Third Bank Eastern Michigan account  That loan, the Lucille loan, it's the subject of count four of the indictment, was the last in time of all of these loan transactions. So again, when you go back to the notion that the government had to prove that Mr. Nicoletti knew that the property that they were seeking to obtain was either owned by a financial institution or in the custody or control of a financial institution, that was not happening at the time any fraudulent misrepresentations were made. Let me ask you this. Is the Eastern Michigan Fifth Third Bank, the one that you say does not exist, that there's not an Eastern Michigan, there's some argument in briefing about that? So your honor, the exhibits that were provided to show what those two official checks were indicated that they were drawn on bank accounts held by Fifth Third Bank Eastern Michigan. That, to my recollection and knowledge, is the only reference in the testimony of the government witnesses about that particular entity. There was no connection between what was presented with the two official checks and Mr. Clifford's testimony about what all of the Fifth Third entities were. Educate me on one more issue. Those two checks, were they from Fifth Third Eastern Michigan placed into Consolidated's account in order to fund the mortgage or were they not checks used, purchased as certified checks for the fraud of enabling them to use that as if it had been down payment money? Which is that? The certified checks. Yes, the two checks from the bank. Were they to mimic the provision of down payment funds supposedly from a straw buyer or were they money from the bank to the mortgage company? I see your question. The testimony from the FBI agent Taylor indicated that those official checks funded the Lucia loan. The loan at issue in the fourth count of the indictment. Funded to the mortgage company, funded that loan. So they went to the mortgage company. Well, I don't know what road they traveled except that they arrived at closing for the purposes of funding the Lucia loan. Okay, thank you. And again, your honor put your finger on something there indicating that for all that Mr. Nicoletti knew at that point was that Fifth Third Mortgage was funding these loans with its own money. Of course, because they were the ones to whom all of the representations had been made to. They were the ones by all appearances had made the funding decision, the decision to make the loan. We knew about the affidavits of occupancy that were submitted in the loan packages that Fifth Third Mortgage indicates in those documents that they were relying upon to make those decisions. And that the mortgages themselves, the security interests securing these loans were in the name of Fifth Third Mortgage. There was no reason to believe otherwise that Fifth Third Mortgage wasn't the one funding the loans with its own money. What do we do with the money that his title company had an account at Fifth Third also and the ill-gotten proceeds were in those accounts and then distributed to him and his co-conspirators? Sure. Is that not enough of enough for the for the bank money part of this? Your honor, that question in my mind goes to the second prong that has to be proven. That the money being obtained must be obtained by means of some sort of misrepresentation. And the misrepresentations at issue at that point in the transactions are not those that led any entity to part with its money. The misrepresentations had already been made by way of the bank loan applications. And so when you get that far downstream... Why aren't the cashier's checks, those are misrepresentations like you're supposedly buyer down payment money that's actually loan proceed money. So you're misrepresenting where the down payment is coming from, right? Again, when you go back to the Supreme Court case in Laughran, the court in that case emphasized that by means of language is intended to be sure that there is a federal interest. And what the the court said in Laughran is that any that the loan, excuse me, that that by means of language has to have some real connection to the federally insured bank. It's the representation in the loan application about the down payment that specifically affected the lending decision. It's not the representation down line that caused anybody to part with their money at that point. So if he had said, by the way, I'm using loan proceeds to make these down payments, the transaction would have gone forward because the bank wouldn't have said, whoa, wait a minute, we need real down payment money. They would have just forgotten about it. It wasn't a misrepresentation at all. I mean, I would love to get that kind of house deal. Sure. Well, it's not that it wasn't a misrepresentation, but that wasn't the misrepresentation that caused the lending entity to part with its money. That had already happened. But why isn't it all part of the same scheme? I mean, if you don't make that representation, you don't get the you don't the the the mortgage company says, oh, wait a minute, I'm not going to lend you the money. Right. All of this stuff has to go to the title company at the same time to to get the purchase price done for the property. Right. I mean, if you don't get that misrepresentation, you don't get the proceeds at all. Right. Well, the. Because the lending decision had already been made, my position is that at that point it was the misrepresentation on the front end about the source of the. So it's not a breach of contract. If I make a lending decision and then somebody misrepresents something and I say, whoa, whoa, whoa, I'm not going to lend you the money like that's a breach of contract. Like I'm I have to lend you the money at that point based on your application. It doesn't make any sense to me. Well, sure. The closing obviously is is a is a continuum. I understand what you're saying about that. But my point is, is that the the misrepresentation that is that must be proven is the one that caused that causes the lending entity to part with its money. And that decision had already been made. Okay. Any further questions? And you've reserved time for rebuttal. Yes. Three minutes. Thank you. Mr. Weir. You're muted. I think you're on muted. Thank you. I was. Thank you. Good afternoon and may it please the court. My name is Craig Weir and I represent the United States in this matter. By conspiring to execute and by scheme to obtain money that was in the custody of Fifth Third Bank, Paul Nicoletti committed bank fraud and bank fraud conspiracy because he did so by means of a scheme that directed some false statements to the insured custodian bank and he intended to obtain money from that bank. So doesn't that fly in the face of Banyan? But what I'm what I'm struggling with is that is that Banyan is pretty clear. And it seems to me that the mere fact that somebody has an account at a bank is not not the type of custody that we're talking about. It has to be the the bank has to be lied to. So I don't think it's good enough to say I have a bank. I have an account at Fifth Third and you and I weren't on the same page. You weren't being quite honest with me. So you've defrauded the bank. I mean, that's Banyan just makes that off limits. So how is it that you have placed sufficient evidence in this record to show that the intent was to get to bank money? And that's why I'm asking who funded the mortgage money? Because that might be the connection you need if you proved it. Yes, and I think we did prove it, Your Honor. And here's how. First of all, let me talk about the intent to obtain bank money. Bank money in law, which Banyan relied on is defined as money belonging to or in the custody or control of an insured federal institution. That's what bank money means. Banyan does not require that the money belong to. When Banyan uses that term bank property, it's referring to the law for a definition of bank property, which is money belonging to or in the custody and control. Well, which very clearly says is not a generic term. It is a very specific term that you must fit your evidentiary case into, right? Yes, absolutely. How did you do it here? Okay. We did it here first by proving conclusively, unlike Banyan. And if the court reads Banyan carefully, it will see that there was never a shred of evidence as to where this came from. They relied exclusively on the subsidiary parent relationship between the entities that were involved. We had the same subsidiary parent relationship. We knew though, as trial counsel, that Banyan was pending before this court and we wanted to avoid the issue about the reliance on the subsidiary parent relationship. So we proved up affirmatively that this money was in the custody of Fifth Third Bank at the time that the loan applications were made. At the time they were dispersed to the Continental title account, which was opened by Paul Nicoletti for his title company at Fifth Third Bank. And at the time, Paul Nicoletti obtained the cashier's checks that represented the fake down payments. It was in the custody of Fifth Third at that time. He had to go or one of his accomplices had to go to a Fifth Third branch to get that money. The money they were getting at that Fifth Third branch belonged to the mortgage company. Yes, it did. At that point it was in the mortgage company's account. So under that argument, anytime I have an account that somebody's trying to defraud money from, it's bank fraud. But that's what Banyan says is not bank fraud. So how did you show that the money in Fifth Third mortgage company, which is where all this went on, was actually Fifth Third Bank's money? Not just in their custody, not just in their bank, but actually fit the Banyan requirements of actual holding by the bank. Judge Strantz, I would respectfully disagree that that's a Banyan holding. And I point to Loughran for that conclusion. Again, Loughran says if it's in the custody of the bank, it fits the statute. And what the court is referring to is whether there was some false statement that went to obtain the money by means of the false statement or by the false pretenses, which I want to get to because I think it answers the court's question. But again, and I underscore, there's no requirement in Banyan or otherwise that the money that they obtained through the fraud scheme belonged to Fifth Third Mortgage. The requirement is that the money was in the custody of Fifth Third Mortgage. And if you accept what the defense counsel is saying, you mean that it was in the custody of Fifth Third Bank? I'm sorry. Yes. Fifth Third Bank. How did you prove, what was the evidence that Nicoletti was aware that the money was not at Fifth Third Mortgage, but was at least in the custody and control of Fifth Third Bank? The court's already covered it in the opening session. So the first, I would say the first evidence are the cashier's checks, which funded count for that loan of Scott Lucia. Mr. Nicoletti received them personally and deposited them personally into his continental title account. The face of the check is say they are drawn on Fifth Third Bank in parentheses, Eastern Michigan. So it tells Mr. Nicoletti that that money funding count for loans was coming from Fifth Third Bank, that it was in the custody of Fifth Third Bank. But he was using, so he was using proceeds from what he thought was the mortgage company using the proceeds to get the cashier's checks, right? Right. When he deposited those checks, the funding checks into his bank account, all of the other loans were funded through direct wire transfers into his bank account. But those two checks are the ones that he had to have known came from the bank because the name of the bank was on the checks. Now with respect to this Eastern Michigan confusion, Judge French, Al Cliffel, who was vice president and on the board at Fifth Third Mortgage at the time, through an analysis of the routing numbers on the actual official checks, testified that those were in the, or came from the custody of Fifth Third Bank, Michigan. Eastern, the word Eastern was in on the check, but it said Fifth Third Bank, Eastern Michigan. They definitely came from Fifth Third Bank, Michigan, which was an insured entity. So the connector here then has to be that he got those funds controlled in the custody of, owned by the bank by means of false or fraudulent pretenses, representations, or promises to the bank, right? In part. And so the, you know, obviously the two, the two elements are intent to obtain bank property and second, meaning property in the custody of the bank, but also by means of. And to limit the scope of 1344-2, which was your concern, Judge French, and Bannion's concern, to limit the scope of that in response to a defense argument in Laughrin that this will make all frauds that the funds were obtained by check a bank fraud. To limit that, the court rejected the idea that we had to show an intent to defraud a bank, but instead said that by means of clause was a limiting clause. And what the court said was, on page 363, that phrase typically indicates that the given result, the end, is achieved at least in part through the specified action, instrument, or method, the means, such that the connection between the two is something more than oblique, indirect, or incidental. So that's what Laughrin requires. It requires that to prevent every pedestrian fraud paid by check to be fortuitously converted to bank fraud, the statute requires some connection between the false pretense and obtaining the money in the custody of the bank. That's what it requires. Now, it did have, it talked about the facts facing Laughrin, that is to say Laughrin talked about the facts before it, and seemed to eliminate some of the more strict language to those facts. And when I say the most strict, the more strict language, it says at the same page, it's true that Laughrin goes on to state that in the context of the facts of that case, quote, by means of language is satisfied when, as here, the defendant's false statement is the mechanism naturally inducing a bank or custodian bank property to part with the money in its control. So we recognize that, Your Honor, but Laughrin also said, as here, or the factual scenario presented to the court here qualifies. It never really fully defined what by means of required. It just said that the facts before this case qualify. And significantly, and I don't like reading from case law, and I apologize for the court for doing this, but this is a significant passage from Laughrin. Laughrin says that language like by means of is inherently elastic. It doesn't mean one thing as to all fact patterns, and certainly not in all statutes. And that limiting language again, all we say here is that the phrase as used in 1344-2 is best read for the federalism related reasons we've given as drawing a line at frauds that have some real connection to a federally insured bank, namely fraud in which a false statement will naturally reach the bank. Are you still on 363? Yes, and that came from, oh, I'm sorry, that was 365. And that was from footnote eight. I apologize, Your Honor. Okay, because I'm looking back at, you know, in talking about it earlier at 363, it talks about that that by means of occurs most clearly when a defendant makes a misrepresentation to the bank itself. And that's what I'm struggling with. So could I ask a question at this point? Please. A little earlier in Laughrin, what does this language mean? Nothing in the clause additionally demands that a defendant have a specific intent to deceive a bank, which would kind of indicate that the specific intent to deceive the mortgage company in this case, if there is knowledge of the relationship between the two and that the money is ultimately coming from the bank, might suffice under Laughrin. Well, I certainly would agree, Your Honor, but I would have to be candid to indicate that we don't have evidence in the record that Mr. Nicoletti specifically knew the subsidiary parent relationship between the bank and the mortgage company. What we do have in the record is a lot of evidence saying that Mr. Nicoletti knew that these funds, these loans were funded by money held in the custody of Fifth Third Bank. And then by that, put hands on that, meaning that his testimony is I knew it was held by the company account. What does that evidence say? Judge Strange, he knew that it was in the mortgage company's, when you say the mortgage company's account, that account was Mr. Nicoletti's account, the continental title account, where the funds came from when they were initially approved before Mr. Nicoletti distributed them. So in terms of his knowledge that the money was in the custody of Fifth Third Bank, yes, because it was in an account that he opened him personally at Fifth Third and the evidence is clear. He admitted that he opened his business accounts at Fifth Third Bank, that branch in his building. So he knew the money was in the custody of Fifth Third Bank. So your position is anytime the money that is being fraudulently or that someone's cheating to get is in an account held by a bank, that means that fraud, that is fraud on the bank. No, that's not our position. Help me then. Tell me, how are you threading this needle? What's the distinction? The distinction here is that false, that in the course of this fairly elaborate fraud scheme involving many accomplices, involving many false statements to different entities, in the course of that scheme, false statements were directly made to Fifth Third Bank, Michigan, and they were directly made as an important part of the scheme in order to falsely obtain fake documentation to show that down payments were being made when in fact down payments were not being made. In essence, Nicoletti and his accomplices used Fifth Third Bank as an instrumentality of this fraud by going to Fifth Third Bank, saying, I need cashier's checks. These down payments are funded by Scott Lucia, for example. Put Scott Lucia's name on that as the remitter, as the purchaser of this cashier's check. They did so. They issued the check to Mr. Nicoletti and or his bank. So those false statements caused transfers of funds in themselves, but they also facilitated the scheme to defraud overall, because as the accomplices testified, they needed Paul Nicoletti to be able to cover this up. And Flynn said, two of the other accomplices told me, Paul Nicoletti could show that the down payments were made by using the proceeds of the fraud scheme of the loans. By using the proceeds of the loan, he could demonstrate false statements were made or that down payments were made. That was an integral part of the fraud scheme that required false statements being made directly to Fifth Third Bank. And that's what takes this case outside of the completely distinguishable and what puts it within the ambit of the Loughran language. This case, I would argue, has a closer connection to a, that the fraud has a closer connection to a financial institution than was presented to the court in Loughran, where some altered checks were presented to Target to get some merchandise. The gentleman walked out, walked right back in, refunded it. The banks were never even shown, the checks were never even shown to go to the bank. So our position is- Take a moment to summarize, please. Oh, sure. I would simply say in closing that because this is a sufficiency case, the court should affirm the convictions after viewing the evidence in the light most favorable to the prosecution. And if any rational juror could have found the essential elements of the crime beyond reasonable doubt, we think that we present sufficient evidence that Mr. Nicoletti both intended to obtain money in the custody of Fifth Third Bank, and he did so by a scheme that included direct false statements to Fifth Third Bank. And for that reason, the conviction should be affirmed. Thank you. Are there any further questions? No. All right. You'll have your time. Go ahead. Thank you. In the light most favorable to the government, the proof showed that Mr. Nicoletti and others submitted loan applications bearing false information with the intent to obtain money that belonged to Fifth Third Mortgage. The government concedes that the money at issue was not- that the loans at issue were funded by money owned by Fifth Third Mortgage. When asked about the custody and control, the government pointed, as I mentioned, that they would to the two official checks. I would also point out that the government also offered exhaustive testimony tracing these funds. There was lots of testimony about a total of six transactions. For five of those six transactions, all that is known about where those funds came from was that they were transferred or they were deposited from a Fifth Third entity. Again, I go back to the entire premise of Banyan, which requires that the intent element to be established requires that Mr. Nicoletti know or at least be aware that those funds are coming from the custody and control of a federally insured depository institution. Do those two checks in the Lucilia loan thread that needle? Because they, in fact, were based on Mr. Nicoletti going to a bank and saying, I need a cashier's check and then I'm going to deposit it into my account. Is that the distinction? Well, those two checks were the checks that funded the Lucilia loan. However, as I noted, those were last in time. Prior to that moment, Mr. Nicoletti had no awareness of any Fifth Third bank involvement in this matter in terms of how the loans were funded. If, in fact, he went to let's say the other ones didn't have the proof they needed. But if, in fact, in that loan, his scheme that he had been doing all along required him or he found himself in the position of going to the bank and getting a certified check and putting it into his from the bank, not from mortgage, but from the bank and putting it in the title company's account in order to complete the scam. Is that not sufficient to take it outside Banyan? Your Honor, that, as I was explaining in my earlier argument, to me goes to the question of the misrepresentation being the mechanism that causes the lending entity to part with its money. And that decision had already been made by the misrepresentations made to Fifth Third mortgage. And Fifth Third mortgage was the one exercising that discretion. We don't know anything about how any otherwise any of those representations made its way to Fifth Third bank until much later in time after the funding decision had already been made by Fifth Third mortgage. And you would say it is inadequate to fund checks as part of a fraudulent scheme and then place those into a Fifth Third account without having gone to the bank and requested those checks with duplicity in mind, shall we say? You would say that's inadequate. That's not the misrepresentation that caused the financial institution to part with its money. Are there any further questions? No. Now, we appreciate this is an interesting case, and we appreciate your briefing, which was good, and your arguments. It will be taken under advisement and an opinion issued in due course.